IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

SINMIER, LLC ) CASE NO.: 3:19-CV-02854

)

    Plaintiff, ) JUDGE JAMES R. KNEPP II

)

v. )

) DECLARATION R. BRYAN TILDEN

EVEREST INDEMNITY INSURANCE )

COMPANY, *et al.* )

)

    Defendants. )

Pursuant to 28 U.S.C. §1746, R. Bryan Tilden declares as follows:

1.     I have been retained as an expert for Bankers Insurance, LLC ("Bankers") for the this matter.

2.     The information contained herein is based upon my personal knowledge.

3.     Attached as Exhibit 1 is a true, accurate, and authentic copy of my expert report setting forth my opinions for this matter.  All of the opinions in my report are stated to a reasonable degree of professional certainty.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   3 1   OCTOBER   , 2022 in Pittsboro, North Carolina.


_____
R. Bryan Tilden

{01525810v1 }

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SINMIER, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 3:19-CV-02854 |
| | ) | |
| EVEREST INDEMNITY INSURANCE | ) | |
| COMPANY, *et al* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Prepared by R. Bryan Tilden, CPCU, CLU, ARM, ALCM, ChFC, CIC, SCLA
TILDEN AND ASSOCIATES
Pittsboro, North Carolina
September 12, 2022

1

EXHIBIT 1

# PREFACE

I, R. Bryan Tilden, offer the following report containing a statement of my opinions and the basis and reasons thereof, the data or other information considered in forming the opinions, my qualifications, and the compensation I am to be paid.

I have been retained by Nicola, Gudbranson & Cooper, LLC, to review certain materials and to, in summary, provide my expert opinions relating to the procurement of an insurance program, all as described in detail in this report.

I have over 48 years of experience in the insurance and risk management industry as an author, agent, broker, consultant, underwriter, drafter of policy forms and endorsements, teacher, historian, claim examiner, and consultant for both the insured and insurers. As a broker representing the insured, I have placed accounts in the international insurance market, including coordinated placements with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, and European insurance companies. I have worked with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, Bermudian, and European companies in the drafting, underwriting, and placement of insurance policies marine and non-marine, and the adjustment of property and liability losses. I teach the construction, drafting, underwriting, adjusting, and analysis of insurance policies throughout the United States, Canada, Mexico, the Caribbean, Bermuda, and the European Union. I have testified in the United States and London regarding the above subject matters. I am familiar with the international insurance and domestic marketplace's custom and practices, including the London, European, Caribbean, Canadian, Bermudian, and United States markets.

I am not an attorney, and nothing in this report should be construed as a legal opinion in any way.  My opinions are based on customs and practices in the insurance industry that comes to bear on this matter.  At the same time, it is not possible to review the handling of matters without reference to industry rules, regulations, policy terms and conditions, the claimed loss, and the transactions at issue.  If any of the terminology or concepts used in this report has any overlap or congruence with legal terms, please be aware that the terms are not being used as legal terms; rather, they are used as terms of art within the insurance industry which are commonly used and understood in the industry.

My curriculum vitae are attached hereto as Exhibit A.  I prepared this report after reviewing the documents listed below.  My billing rate for consulting expert and expert witness work is $300 an hour.[1]  Because discovery is ongoing, I reserve the right to supplement or amend this report based on the new information.  These are my opinions to a reasonable degree of professional certainty.

## DOCUMENTS PROVIDED

1. Complaint with Exhibits;

2. Bankers Answer and Cross-Claim against Defendant Ventro Hotel & Resorts Ohio, LLC;

3. Berkley Documents BATES Berkley_000001 – BERKLEY_000533;

4. Everest Documents BATES EVEREST 00001 – EVEREST 02995;

---

[1] No portion of my compensation is dependent upon the result of this litigation.

5. Bankers Documents BATES Bankers 0001 – Bankers 3790;

6. Bankers Supplemental Document Production BATES Bankers 3791 – Bankers 13,168;

7. Records Response from Alex N. Sill Company BATES Alex Sill 0001 – Alex Sill 4742;

8. Updated Global Midwest Adjusters International Expert Report BATES SM 7501 – SM 9554;

9. Redacted Verizon Phone BATES Bankers 12971 – Bankers 13119;

10. J. S. Held Document Production BATES J.S.HELD_00001 – J.S.HELD_01167, missing pages 170, 171, 175;

11. Craig J. Andrews, C.P.C.U. Expert Report of October 12, 2020;

12. Declaration of Craig J. Andrews, C.P.C.U. dated June 6, 2022;

13. Chris A. Johnson, JD, Expert Report of August 22, 2022;

14. Akos Swierkiewicz, C.P.C.U. Expert Report of August 22, 2022;

15. Plaintiff's Updated Expert Report of Ethan Gross/Globe Midwest and related exhibits;

16. Crawford Document Production BATES CRAWFORD 000001 – CRAWFORD 000469;

17. Vintro Combined Document Production BATES V 1 – V 1815;

18. Southern Title Document Production BATES SOUTHERN TITLE 0001 – SOUTHERN TITLE 0318;

19. Sinmier Document Production BATES Sinmier00001 – Sinmier000222; SM 5001 – SM 9554;

20. Perkins Township Document Production BATES PERKINS 000001 – PERKINS 000399;

21. Ohio Edison Document Production BATES OHIO EDISON_000001 – OHIO EDISON_000085;

22. Longlake Document Production BATES LONGLAKE 000001 – LONGLAKE 000510;

23. Erie Shores files from Kirk Halpin BATES HALPIN 00001 – HALPIN 10030;

24. Grewal Document Production BATES GREWAL 0001 – GREWAL 4921;

25. Geneva Capital Document Production BATES GENEVA 000001 – GENEVA 007603;

26. East Coast Environmental Restoration Document Production BATES ECER_00001 – ECER_00040;

27. A.V. Lake Document Production BATES A.V. LAKE 0001 – A.V. LAKE 0118;

28. ARC Document Production BATES PROD_to_PLTF_000001 – PROD_to_PLTF_005506, and

5

29. Depositions

    a.  Linda Annette Allen and exhibits;

    b.  Barbara Loveland and exhibits;

    c.  Leah-Ann Combs and exhibits;

    d.  Chad Brown and exhibits;

    e.  Bela Patel and exhibits;

    f.  Daniel Speidel and exhibits;

    g.  Brian Lake and exhibits;

    h.  Pargat Grewal Volumes I, II, III, IV and exhibits;

    i.  Lee Friedman, Volume I and exhibits;

    j.  Angela Holcomb and exhibits;

    k.  David Myers and exhibits;

    l.  Inderjit Grewal and exhibits;

    m.  James Hennig and exhibits;

    n.  Melanie Petulla and exhibits;

    o.  Michael Barnum, Vols. I, II and exhibits;

    p.  Michael Fichtelberg and exhibits;

6

    q.   Paul Ricci and exhibits;

    r.   Ryan Barron and exhibits;

    s.   Vanja Tomic and exhibits.

# PARTIES REFERRED TO IN THIS REPORT

1. Vintro Hotel & Resorts Ohio, LLC ("Vintro") did business as Doubletree Sandusky Ohio, also known as "Maui Sands Resort":

   a. Inderjit Grewal

   b. Lee Freidman – Consultant to Vintro;

   c. Angela Holcomb – Office Manager;

   d. David Myers – Employee;

2. Sinmier, LLC ("Sinmier") is the mortgagee:

   a. Pargat S. Grewal, Manager

3. Bankers Insurance, LLC ("Bankers") is an independent insurance agency:

   a. Annette Allen, CIC, CISR, Risk Marketing Manager;

   b. Barbara Loveland, AAI, Executive Claims Manager;

   c. Bela Patel, Commercial Account Manager;

   d. Michael Barnum, CIC, Sales Executive;

   e. Leah-Ann Combs, Customer Service Representative;

4. Alternative Risk Company, wholesale insurance brokerage firm:

   a. Chad Brown, President;

   b. Vanja Tomic – (Outsource Insurance Professionals) – Submission Processing;

7

5. Everest Insurance Company ("Everest"):

    a. Ryan Barron, Associate Manager – Property and Liability Claims;

    b. Melanie Petulla – Underwriting Assistant;

6. Crawford & Company ("Crawford"):

    a. Mike Fichtelberg – Executive General Adjuster;

7. Matson Driscoll & Damico LLP ("MDD")

    a. Jonathan Hiland

8. Globe Midwest – Public Adjuster hired by Sinmier:

    a. Kyle Vandenbussche

9. Specialty Insurance Group (EverSports and Entertainment Insurance) – Managing General Agent:

    a. Daniel Speidel;

10. A. V. Lake Construction Company:

    a. Brian Lake – Project Manager;

11. Berkley Fire & Marine:

    a. James Hennig – Underwriter;

12. Perkins Township:

    a. Paul Ricci – Building and Code Enforcement Officer;

# BACKGROUND

*Reference For Purposes of this Report*

| Maui Sands Resort | | | |
|---|---|---|---|
| Location Number | Description[2] | Berkley Builders' Risk Limits[3] | Everest Limits |
| 1 | 96-room Hotel Family Suites<br>4000 block of rooms | $10,000,000 building<br>$2,500,000 building material | $6,000,000[4] |
| 2 | 40-room Maui West – Holiday Inn<br>2000 block of rooms | $1,677,000 building<br>$2,000,000 building material | $0[5] |
| 3 | 167-room Maui East Cabana<br>3000 block of rooms | $12,150,000 building<br>$3,500,000 building material | $0[6] |
| 4 | Waterpark | $7,500,000 building<br>$2,000,000 building material | $1,000,000[7] |



[8]

---

[2] Everest 01331.

[3] BERKLEY_000021, Bankers 11117.

[4] Everest 00742.

[5] Everest 01434.

[6] Everest 01436.

[7] Everest 00881.

[8] Bankers 0494.

9

*Permanent Insurance and Builders' Risk*

For the August transactions, it appears that a quotation was obtained from Everest which, for the purposes of this report, will be termed the Permanent Insurance.  This was for building one, business personal property, and business income with extra expense.  The second quotation was from Berkley, and for the purposes of this report was a builders' risk policy for the proposed demolition, construction, and renovations.

Mr. Barnum was introduced to Vintro by Mr. Friedman who was with Days Inn, Spokane, Washington.[9]  He started working on the Vintro account in July of 2018.[10]  He did not charge any fees to Vintro.[11]  Mr. Barnum was advised by Vintro that the plans were to renovate or demolish two buildings and one would continue operating.[12]  Mr. Barnum obtained the underwriting information that was found on the applications.[13]

The limits of insurance were from Mr. Grewal which were provided in a conversation.[14]  Based on an email dated August 3, 2018, the estimated cost of the improvements was $15 million.[15]  Mr. Barnum understood that the renovations would start right away after closing on the property.[16]  A building Underwriting Report was in the Bankers file dated February 1, 2013, and included a Verisk Risk Solution date of August 9, 2018, as a footer.[17]  As of August 13, 2018, Mr. Barnum understood the location to be three different buildings and one inside/outside waterpark.[18]

---

[9] Deposition of Michael Barnum, 31:5 – 14.
[10] Deposition of Michael Barnum, 32:7 – 11.
[11] Deposition of Michael Barnum, 49:16 – 20.
[12] Deposition of Michael Barnum, 30:16 – 21, 38:5 – 39:16, 41:1 – 5.
[13] Deposition of Michael Barnum, 73:14 – 17.
[14] Deposition of Michael Barnum, 80:21 – 81:2.
[15] Deposition of Michael Barnum, 30:16 – 21; Bankers 0820 – Bankers 0821.
[16] Deposition of Michael Barnum, 98:16 – 24.
[17] 17 Bankers 0350 – Bankers 0363.
[18] Bankers 2036.

As previously discussed, the values of the existing buildings and proposed renovations were provided by Mr. Grewal.[19]  There is a large range of values that will be discussed in this report.  Sinmier is claiming damages of $24,731,272.97,[20] which will be discussed later in this report.  Vintro misrepresented that it was paying $18.95[21] million for the property, where actually Vintro paid $4.85 million.[22]  The limits of insurance for the Berkley and Everest policies will be discussed later in this report.

In response to the ACORD application, on August 10, 2018, Everest provided the first quotation to Bankers for a proposed August 18, 2018, inception date.[23]  Building 1 showed a limit of $5,000,000 for building, $1,440,000 for personal property, and $3,000,000 business income with extra expense.[24]

The initial written proposal to Vintro was dated August 20, 2018.[25]  The initial request for coverage by Vintro resulted in a commercial property policy and a builders' risk policy, including liability insurance.[26]

On August 20, 2018, Vintro requested the binding of coverage per the Bankers' proposal on four buildings.[27]  On August 20, 2018, Ms. Allen forwarded applications for BPP [business personal property] and BI [business income] coverage to Alternative Risk Company to see if Everest would provide a quotation.[28]  On August 21, 2018, Ms. Allen sent Mr. Barnum premium

---

[19] Deposition of Michael Barnum, 80:21 – 81:2.
[20] SIM 20217.
[21] Deposition of Pargat Grewal, 66:19 – 67:13; Sinmier000178.
[22] HALPIN 01168.
[23] Bankers 0406 – Bankers 0412.
[24] Bankers 0407 – Bankers 0408.
[25] Complaint, ¶ 17; Bankers 0711 – Bankers 0725.
[26] Deposition of Michael Barnum, 131:13 – 18.
[27] V 422.
[28] Bankers 0393 – Bankers 0403.

11

quotations.[29]  After the initial application was submitted, Vintro disclosed to Bankers on August 21, 2018, the existence of Sinmier as a mortgagee.[30]  Mr. Friedman, by email dated August 21, 2018, provided the lender information of Sinmier and requested additional insured status for liability and mortgagee for the property.[31]

On August 21, 2018. Berkley provided a builders' risk proposal for the existing buildings and renovation.[32]  The builders' risk quote included the Cabana building because it would be rebuilt.[33]  This quotation was based on an application dated August 9, 2018.[34]

On August 22, 2018, Everest provided a revised quotation for building 1 increasing the business income with extra expense to $9,500,000 and reducing the building and personal property to a blanket limit of $4,790,000, both agreed value.[35]  Agreed value suspends coinsurance.  On August 23, 2918, Specialty Programs declined to provide a quotation.[36]

A supplemental Liquor Labiality Application was completed with a proposed effective date of August 22, 2018.[37]  Berkley was bound for builders' risk and Everest for building, business personal property, and business income on August 23, 2018.[38]

---

[29] Bankers 0392.
[30] Deposition of Michael Barnum, 44:22 – 45:13.
[31] Bankers 0404.
[32] Bankers 2305 – Bankers 2309.
[33] Deposition of Michael Barnum, 40:2 – 5.
[34] BERKLEY_000195 – BERKLEY_000199.
[35] Everest 002236.
[36] Bankers 0391.
[37] Bankers 0382 – Bankers 0385.
[38] Deposition of Michael Barnum, 99:14 – 25.

*Sinmier, LLC*

Sinmier, LLC's sole business purpose was to lend money to Vintro.[39]  The property sold at auction in 2012 after a prior foreclosure for two and a half million dollars.[40]  When Sinmier was first approached by Vintro, it was for a $14 million loan.[41]  Sinmier would loan up to 50 percent of the purchase price.[42]  The purchase price on the contract was $18,950,000.[43]

$7 million was loaned to Vintro for the acquisition of Maui West.[44]  It was for a bridge loan for a term of one year.[45]  $2 million was held back in escrow for capital improvements.[46]  $1.7 million was for the renovation of the rooms to meet ADA standards for the family suites.[47]  $627,375 was released from the escrow for A.V. Lake, but Lake never received it.[48]  After Sinmier resolved the case with Vintro, Sinmier received the balance of the escrow back.[49]  A deed of foreclosure was dated October 4, 2019, and Sinmier received the property.[50]  Sinmier's net cash out for the loan was $5,627,375 and it received a property purchased the previous year for $4.85 million.

---

[39] Deposition of Pargat Grewal, 17:23 – 18:6.
[40] Deposition of Pargat Grewal, 55:2 – 10.
[41] Deposition of Pargat Grewal, 40:14 – 18.
[42] Deposition of Pargat Grewal, 58:20 – 23.
[43] Deposition of Pargat Grewal, 66:19 – 67:13; Sinmier000178.
[44] Deposition of Pargat Grewal, 36:19 – 24, 44:9 – 15.
[45] Deposition of Pargat Grewal, 47:21 – 25, 48:14 – 17.
[46] SOUTHERN TITLE 0007, SOUTHERN TITLE 0195 – SOUTHERN TITLE 0203; Deposition of Pargat Grewal, 136:15 – 21.
[47] Deposition of Pargat Grewal, 92:18 – 22.
[48] Deposition of Pargat Grewal, 106:5 – 107:7.
[49] Deposition of Pargat Grewal, 153:5 – 12.
[50] Bankers 2132.

*Closing*

The closing date for the mortgage was September 6, 2018.[51]  The loan agreement was dated September 8, 2018.[52]  At the time of closing, Sinmier received certificates from Vintro as an additional insured and mortgagee.[53]  The evidence of property insurance dated August 23, 2018, provided to Sinmier as mortgagee showed Berkley policy number MIM-1022859-50.[54]  Bankers provided the certificate to Vintro, and Vintro provided it to Sinmier.

It is the custom and practice of the insurance industry for an insurance agent to provide Evidence of property insurance for a real estate closing showing the date coverage was bound.  In my experience as an insurance agent and broker, the mortgagee wants the policy inception date to coincide with the closing date, but that was not done in this case.  If Sinmier had requested an updated Evidence of Property Insurance, Bankers would have known the deal closed, and could have contacted the insurance companies and had the policies reissued.

*Cancellation of August Policies*

Contrary to the facts now known, Vintro again misrepresented, and advised Bankers that the closing did not occur.  One of the reasons stated to Bankers for the delay in the closing was a survey.[55]  Because Bankers was told that the closing did not occur, Bankers inquired if the policies could be canceled flat.  On September 14, 2019, Mr. Brown advised Mr. Barnum that Everest and StarStone would flat cancel the policies and rewrite them with the new effective date when the

---

[51] Complaint, ¶ 13.
[52] SM 7391 – SM 7415.
[53] Complaint, ¶ 14.
[54] Complaint, ¶ 21; Bankers 0332 – Bankers 0333, Bankers 0335 – Bankers 0339, Bankers 0341 – Bankers 0343, Bankers 0345 – Bankers 0346, Bankers 0368 – Bankers 0373, Bankers 0376; Deposition of Barbara Loveland, 48:6 – 49:13.
[55]

14

closing did occur.[56]  Berkley shows a flat cancelation per the insured's request.[57]  When a policy is canceled flat, it is *ab initio*.  The insured would owe no premium for the policy, as a flat cancellation is an agreement that the policy never existed.  Because the policies never existed, no notice of cancellation would be provided to any insured or additional interest.  Mr. Grewal was advised that the insurance companies agreed to cancel the policies flat on October 4, 2018.[58]

*Building #2 and Building #3*

In October, Bankers was specifically instructed not to procure the builders' risk coverage.[59]  For the unlisted buildings, Vintro's plans were to demolish them and declined to obtain coverage on them.[60]  Vintro stated to Mr. Burnum that the general contractor would provide builders' risk coverage on the renovations.[61]  On November 21, 2018, Vintro accepted a proposal from Denslow Mechanical LTD to demolish the Cabana Building and Holiday Express with start and completion dates "ASAP".[62]  Vintro received a second proposal from Telamon Construction dated December 3, 2018, for the demolition of the building in front of Maui Sands.[63]  On December 6, 2018, Vintro forwarded to Sinmier an email chain with proposals for the demolition of the Cabana Building and Holiday Inn Express buildings.[64]

Most insurance policies are considered contracts of indemnity.  Indemnity may be defined as compensation given to make the person whole from a loss already sustained.  Under a *contract*

---

[56] Bankers 11102.
[57] BERKLEY_000076.
[58] Bankers 0029.
[59] Deposition of Michael Barnum, 43:10 – 19.
[60] Deposition of Barbara Loveland, 73:5 – 78:3; 94:8 – 13; Bankers 2172, Bankers 3784.
[61] Deposition of Michael Barnum, 41:16 – 23.
[62] GREWAL 1688 – GREWAL 1689.
[63] V 1358.
[64] V 1352; Deposition of Pargat Grewal, 90:13 – 19; GREWAL 3910 – GREWAL 3911.  The attachments were the A. V. Lake proposal, Denslow Mechanical and signed Denslow Demolition proposal.

*of indemnity,* the insured is entitled to payment only if he or she has suffered a loss and then only up to the extent of the financial loss he or she actually incurred.  When an insured schedules demolition of an existing building, they cannot sustain a financial loss, as they have established the value as zero.

Insurance is a contract of indemnity when the amount the insurer pays is directly related to the amount of the insured's loss.  Because of this concept, in the custom and practice of the insurance industry, a building scheduled for demolition is considered to have no value.  A policy can be obtained for new construction, additions, repairs, or renovations for damage by a covered cause of loss, but not for a building scheduled for demolition.  Based on the facts represented to Bankers that the buildings would be demolished, if the information was provided to an underwriter, insurance on the buildings would not have been provided, because the insured considers them to have no value.

### Everest Building Policy

On October 16, 2019, Mr. Barnum advised Mr. Brown of a new effective date of October 19, 2018, and requested coverage for building one only, a separate limit for the waterpark, and advising that buildings two and three would be demolished.[65]  On October 16, 2018, Mr. Barnum memorialized what Vintro was asking for in an email to Alternative.[66]  Vintro represented that it did not need builders' risk coverage because the general contractor would be providing the coverage.[67]

---

[65] Bankers 11101.
[66] Deposition of Michael Barnum, 141:8 – 20; Bankers 10937.
[67] Deposition of Michael Barnum, 142:5 – 9.

16

On October 17, 2018, Bankers submitted a commercial property application to Everest for building one, and listed Sinmier as mortgagee twice: 1) on the ACORD 125, Commercial Insurance Application:[68]

| ADDITIONAL INTEREST (Not all fields apply to all scenarios - provide only the necessary data)  Attach ACORD 45 for more Additional Interests | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| INTEREST | | NAME AND ADDRESS   RANK: | EVIDENCE: | CERTIFICATE | POLICY | SEND BILL | INTEREST IN ITEM NUMBER | | |
| ADDITIONAL INSURED | LOSS PAYEE | Sinmier, LLC, Its successors and/or assigns 3021 Orchard Lake Rd #120 West Bloomfield, MI 48334 | | | | | LOCATION: | | BUILDING: |
| BREACH OF WARRANTY | X MORTGAGEE | | | | | | VEHICLE: | | BOAT: |
| CO-OWNER | OWNER | | | | | | AIRPORT: | | AIRCRAFT: |
| EMPLOYEE AS LESSOR | REGISTRANT | | | | | | ITEM CLASS: | | ITEM: |
| LEASEBACK OWNER | TRUSTEE | | | | | | ITEM DESCRIPTION | | |
| LIENHOLDER | | REFERENCE / LOAN #: | | INTEREST END DATE: | | | | | |
| | | LIEN AMOUNT: | | PHONE (A/C, No, Ext): | | | FAX (A/C, No): | | |
| REASON FOR INTEREST: | | | | E-MAIL ADDRESS: | | | | | |

ACORD 125 (2013/09)                                           Page 2 of 4

and 2) on the ACORD 45, Additional Interest Schedule:[69]

| INTEREST | | NAME AND ADDRESS   RANK: | EVIDENCE: | CERTIFICATE | POLICY | SEND BILL | INTEREST IN ITEM NUMBER | | |
|---|---|---|---|---|---|---|---|---|---|
| ADDITIONAL INSURED | LOSS PAYEE | Sinmier, LLC, Its successors and/or assigns 30201 Orchard Lake Rd #120 West Bloomfield, MI 48334 | | | | | LOCATION: | | BUILDING: |
| BREACH OF WARRANTY | X MORTGAGEE | | | | | | VEHICLE: | | BOAT: |
| CO-OWNER | OWNER | | | | | | AIRPORT: | | AIRCRAFT: |
| EMPLOYEE AS LESSOR | REGISTRANT | | | | | | ITEM CLASS: | | ITEM: |
| LEASEBACK OWNER | TRUSTEE | | | | | | ITEM DESCRIPTION | | |
| LIENHOLDER | | REFERENCE / LOAN #: | | INTEREST END DATE: | | | | | |
| | | LIEN AMOUNT: | | PHONE (A/C, No, Ext): | | | FAX (A/C, No): | | |
| REASON FOR INTEREST: | | | | E-MAIL ADDRESS: | | | | | |

The Acord 140, Property Section, did not specifically note Sinmier as a mortgagee, but stated: "***ACORD 45 attached for additional names***,"[70] [emphasis added] as the ACORD 140 had space for one additional interest, there were two additional interests on the ACORD 45.

| ADDITIONAL INTEREST | | ACORD 45 attached for additional names | | | | | | |
|---|---|---|---|---|---|---|---|---|
| INTEREST | | NAME AND ADDRESS   RANK: | EVIDENCE: | CERTIFICATE | | INTEREST IN ITEM NUMBER | | |
| LOSS PAYEE | | | | | | LOCATION: | | BUILDING: |
| MORTGAGEE | | | | | | ITEM CLASS: | | ITEM: |
| | | | | | | ITEM DESCRIPTION | | |
| | | REFERENCE / LOAN #: | | | | | | |

ACORD 140 (2014/12)                         Attach to ACORD 125     © 1985-2014 ACORD CORPORATION.  All rights reserved.

---

[68] Everest 01421; V 427.
[69] Everest 01424; V 430.
[70] Everest 01433; V 439.

17

On the ACORD Equipment Floater Section for the water park, there was an "**x**" in the box to the left of "**ACORD 45 Attached**."[71] [emphasis added] The ACORD 45 indicated that Sinmier was to be added as mortgagee on the Equipment Floater.[72]

| ADDITIONAL INTEREST / CERTIFICATE RECIPIENTS | | | X ACORD 45 Attached | | | |
|---|---|---|---|---|---|---|
| INTEREST | RANK: | NAME AND ADDRESS | REFERENCE #: | CERTIFICATE REQUIRED | INTEREST IN ITEM NUMBER | |
| LOSS PAYEE | | | | | LOCATION: | BUILDING: |
| LIENHOLDER | | | | | SCHEDULED ITEM NUMBER: | |
| | | | | | OTHER | |
| | | ITEM DESCRIPTION: | | | | |

Everest was on notice, by Bankers' submission of the ACORD 45 Additional Interest Schedule, that there were additional interests to be listed as mortgagees. If there was any confusion as to the ACORD 45 Additional Interest Schedule, the custom and practice of the insurance industry are for Everest, through the distribution channel, to contact Bankers for an explanation as to how the mortgages should be listed. Instead, Everest remained silent and listed neither mortgagee.

Everest issued a commercial property policy number SI8ML01612181 to Vintro effective October 19, 2018.[73] The Everest policy listed Building #1 $6,000,000 for building coverage, $1,244,000 for business personal property, and $500,000 for business income.[74] The Everest policy did not list a mortgagee, even though the applications requested it.[75]

It should also be noted that the signed ACORD applications for Building #2, 40 room Maui West[76] and Building #3, 167 room Maui East Cabana Village Hotel[77] did not show any limits for buildings, business personal property, or business income with extra expense.

---

[71] EVEREST 01430.
[72] EVEREST 01424.
[73] Complaint, ¶ 26; Bankers 0141 – Bankers 0330.
[74] Complaint, ¶ 27; Bankers 0155.
[75] Complaint, ¶ 28.
[76] Everest 01434.
[77] Everest 01436.

18

On October 18, 2018, Mr. Grewal was asked to sign the applications.[78]  The application package to Everest indicated that Sinmier, LLC, its successors and/or assigns had an interest as a mortgagee.[79]  On October 23, 2018, a certificate of liability insurance showing Everest was issued to the Ohio Department of Agriculture.[80]  On December 19, 2018, a certificate of liability insurance was created and provided to Vintro.[81]

*Additional Interests*

The mortgagee clause in the Everest policy is typical and states, in part:

> **"2. Mortgageholders**
>
> **b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.
>
> **c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.
>
> **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:
>
> **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;
>
> **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and
>
> **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.
>
> All of the terms of this Coverage Part will then apply directly to the mortgageholder."[82]

---

[78] Bankers 0031.
[79] Everest 01424.
[80] Bankers 0374.
[81] Bankers 0375.
[82] Everest 00207.

Paragraph **D.** is inapplicable because the claims to building two and three were not denied because of Vintro's acts or failure to comply with the terms of this coverage part, rather it was denied because Vintro chose not to purchase coverage on them.

Paragraph **A.** concludes with "as interests may appear."  The origin of *as interests may appear* comes from marine policies written to include the cargo being carried by a ship regardless of the actual ownership of the goods.  In the custom and practice of the insurance industry, if a mortgagee decides to commence with foreclosure proceedings, and a property loss occurs prior to a confirmation of the sheriff's sale, the mortgagee will have the option to either recover from the insurance proceeds the full amount of the mortgage obligation (or the amount due under the policy, if less), or the mortgagee may foreclose on the mortgaged real estate and, to the extent the foreclosure sale does not satisfy the mortgage loan, recover the balance from the insurance proceeds, as that is the mortgagee's *interest*.  If the mortgagee elects to foreclose on the property and receives the full unpaid principal balance of the mortgage loan in a sheriff's sale, the custom and practice of the insurance industry not to pay insurance proceeds, as the mortgagee's *interests* under the policy would have been satisfied.

The waterpark was insured under a Scheduled Property Floater[83] which did not include a mortgagee clause.  Additional interests, under a Scheduled Property Floater, can be added by endorsement.  American Association of Insurance Services ("AAIS") has an endorsement that includes a loss payable, lender's loss payable, and contract of sale clauses.  While a loss payable clause is derivative in nature, the lender's loss payable clause is similar to the mortgagee clause.

---

[83] EVEREST 01292 – EVEREST 01309.

20

This endorsement was not attached as requested.   An example, AAIS IM-6668 Loss Payable Endorsement, follows:

**AAIS**
**IM-1668  Ed 1.0**
**Page 1 of 1**

This endorsement changes the
Inland Marine Coverage
-- PLEASE READ THIS CAREFULLY --

## LOSS PAYABLE ENDORSEMENT

In addition to the policy "terms" contained within the Inland Marine Coverage(s), the following conditions apply to described property as indicated on the "declarations".

**LOSS PAYABLE**
Any loss shall be adjusted with "you" and shall be payable to "you" and the loss payee described on the "declarations" as "your" and their interests appear.

**LENDER'S LOSS PAYABLE**
Any loss shall be payable to "you" and the loss payee described on the "declarations" as interests appear. If more than one loss payee is named, they shall be paid in order of precedence.

The insurance for the loss payee continues in effect even when "your" insurance may be void because of "your" acts, neglect, or failure to comply with the coverage "terms". The insurance for the loss payee does not continue in effect if the loss payee is aware of changes in ownership or substantial increase in risk and does not notify "us".

If "we" cancel this policy, "we" notify the loss payee at least ten days before the effective date of cancellation if "we" cancel for "your" nonpayment of premium, or 30 days before the effective date of cancellation if "we" cancel for any other reason.

"We" may request payment of the premium from the loss payee, if "you" fail to pay the premium.

If "we" pay the loss payee for a loss where "your" insurance may be void, the loss payee's right to collect that portion of the debt from "you" then belongs to "us". This does not affect the loss payee's right to collect the remainder of the debt from "you". As an alternative, "we" may pay the loss payee the remaining principal and accrued interest in return for a full assignment of the loss payee's interest and any instruments given as security for the debt.

If "we" choose not to renew this policy, "we" give written notice to the loss payee at least ten days before the expiration date of this policy.

**CONTRACT OF SALE**
Any loss shall be adjusted with "you" and shall be payable to "you" and the loss payee described on the "declarations" as "your" and their interests appear.

The loss payee described above is a person or organization "you" have entered into a contract with for the sale of covered property.

When covered property is the subject of a contract of sale, the word "you" also means the loss payee.

**IM-1668  Ed 1.0**
Copyright MCMXCIV
American Association of Insurance Services

*Initial Claim*

On or about January 26, 2019, Vintro reported a claim involving frozen and or broken water pipes, damage to electronic signs and the HVAC system.  The initial claim was a water and wind loss.[84]  An email from Mr. Friedman dated January 27, 2019, was the first notice of loss.[85] Pipes located in rooms 2218 and 2222 in Maui West froze due to extreme cold, causing the pipes to burst.[86]

The claim was initially turned in by Mr. Barnum.[87]  Bankers did not have a copy of the policy so there was confusion about where the claim should be reported.[88]  It was initially reported incorrectly to York Claims Services on January 31, 2019.[89]  Everest acknowledged the claim on February 1, 2019.[90]  The initial visit by the remediation company was for the Maui West building.[91]

On February 4, 2019, Mr. Barron advised Ms. Loveland that Crawford reported another pipe burst the previous night in one of the buildings not covered under Everest.[92]  On February 26, 2019, Mr. Barnum advised Ms. Loveland that the majority of the claim is in the waterpark building and air handling units that caught fire.[93]

---

[84] Complaint, ¶ 4, ¶ 11, ¶ 29.
[85] Bankers 0386 – Bankers 0390.
[86] Everest 00914.
[87] Deposition of Barbara Loveland, 19:1 – 4; Bankers 0012.
[88] Deposition of Barbara Loveland, 19:14 – 18; 20:20 – 25; 33:14 – 22.
[89] Deposition of Barbara Loveland, 32:6 – 33:22; Bankers 1470 – Bankers 1471.
[90] Deposition of Barbara Loveland, 31:12 – 23, 70:19 – 72:8; Bankers 1777, Bankers 0641.
[91] Bankers 4739.
[92] Deposition of Barbara Loveland, 78:1 – 81:4; Everest 00353.
[93] Deposition of Barbara Loveland, 86:4 – 87:19; Bankers 11101.

*J.S. Held*

Based on a site inspection on January 29, 2018, JS Held provided an estimate for the damages dated May 11, 2018.[94]  The insured felt that the HVAC units needed to be replaced and the JS Held felt they could be repaired.[95]

Mr. Barron pointed out that the buildings with the pipe breaks that were not covered by Everest were intended to be demolished and Mr. Friedman mentioned that there was a builders' risk policy in place.[96]

Bankers provided Evidence of Property Insurance on February 8, 2019,[97] which showed an effective date and an expiration date of August 23, 2018, which demonstrated that the Berkley policy had been canceled flat.[98]

By letter dated March 6, 2019, Everest declined coverage on buildings two and three.[99]  By email dated March 7, 2019, Barbara Loveland reminded Mr. Friedman and Mr. Grewal that only the water park and the family suites are covered under the policy.[100]  Vintro and Bankers were provided a copy of the declination letter by email dated March 13, 2019.[101]

On June 5, 2019, Everest by letter to Vintro, reaffirmed that damage to the two uninsured buildings was not covered, and acknowledged that $250,000 for damages had been paid out for the waterpark.[102]

---

[94] Alex Sill 2207 – Alex Sill 2303.
[95] Deposition of Barbara Loveland, 28:5 – 20; Bankers 0331.
[96] Bankers 1806.
[97] Bankers 0340, Bankers 0344, Bankers 0367.
[98] Complaint, ¶ 23; Bankers 0334.
[99] Everest 00914 – Everest 00916.
[100] Deposition of Barbara Loveland, 23:22 – 23:24; Bankers 0331.
[101] Everest 00917.
[102] Bankers 4826 – Bankers 4828.

MDD made their initial request for documents to begin a review of the business income and extra expense loss by email dated February 11, 2019.[103]  MDD followed up on the business income document request by email dated March 13, 2019.[104]

*Sworn Statement in Proof of Loss*

Michael Fichtelberg of Crawford sent Mr. Friedman an email on February 12, 2019, with the first Sworn Statement in Proof of Loss to be completed which Vintro executed and requested that the funds be payable to Vintro.[105]  Bankers would not review or verify the existence of an encumbrance because it is left to the insurance company adjuster.[106]

Crawford did not do anything other than looking at and relying on the Everest policy to determine if any additional interest existed.  *Casualty, Fire & Marine Investigation Checklists,* in § 19:3 Identification of the insured and insurable interests in part, states:

> "[2] Lienholders, Loss Payees, and Mortgagees
>
> * * * * *
>
> A lienholder does not necessarily have to be specifically named on a policy contract in order to be protected by that contract.  One of the aspects of a Sworn Statement in Proof of Loss required to be filed by an insured as part of the claim is the identification of any other party who may have an "insurable interest" in the property for which claim is made.  Any identified party should be included as a payee.
>
> * * * * *
>
> [3] Other Insurable Interests
>
> Check to see if there are other insurable interests besides those of lienholders or mortgagees.  These may not necessarily be listed on the policy.  Estate heirs, trusts, guardianships, administrators or executors, and possibly unlisted family members may have an

---

[103] V 95 – V 96.

[104] V 94.

[105] Deposition of Barbara Loveland, 29:8 – 30:12, 35:2 – 36:1, 83:19 – 85:1; Bankers 380 – Bankers 0381; Everest 00523 – Everest 00524.

[106] Deposition of Barbara Loveland, 37:9 – 38:8.

interest in dwellings and personal property covered under a policy. A bankruptcy court may assign interest to creditors. In corporations, a board of directors may assign interests to other parties, such as another corporation which has purchased certain assets of the company or has merged with the corporation.[107]

The existence of an *equitable lien* is common in adjusting a property loss. In fact, East Coast Mitigation asserted an *equitable lien*. Because the work was done to buildings not covered by the Everest policy, the East Coast Mitigation claim was not paid. Vintro was not entitled to be indemnified for damages to buildings it chose not to insure. The denial to East Coast Mitigation was correct, as its rights would be derivative of Vintro's rights, and not independent against Everest.

Because of home equity lines of credit ("HELOC"), it has become the custom and practice of the insurance industry to utilize public records to determine the existence of liens on the property. Many times, there are liens (mortgage, HELOC, contract of sale, etc.) that are available by researching public records. Here, with total insured values of $7,000,000 for building one and the waterpark, Crawford relied on the Everest policy to determine any person or organization *contractually* entitled to benefits, and concluded that it was solely Vintro.

Crawford did not research public records for the existence of Sinmier's mortgage on the property. Adjusters, in custom and practice and are taught,[108] that an unlisted mortgageholder has an *equitable lien* on the insurance proceeds paid to the insured debtor and that the unlisted mortgageholder may intervene in the insured's lawsuit against the insurer. However, this will not necessarily protect the mortgageholder in the event that the coverage is voided by some act of the

---

[107] Magarick, Pat, J.D., L.L.M. and Ken Brownlee, C.P.C.U., *Casualty, Fire & Marine Investigation Checklists,* Tenth Edition. (Thomson Reuters, 2019), page 783.  See also *Wheeler v. Ins. Co.,* S.C.U.S. (1879), 101 U.S. 439.
[108] Thomas, Paul J. and Prentiss B. Reed, Sr., *Adjustment of Property Losses,* Fourth Edition (New York: Gregg Division, McGraw-Hill Book Company, Inc., 1977), pages 65 and 66.

insured.  That was not the case here, because Everest has not voided the policy because of acts of Vintro.  In adjusting custom and practice, Sinmier was an unlisted mortgageholder, and should have been adjusted as a holder of an *equitable lien* whose rights are derivative of Vintro's rights.

Partial payments of $100,000 were issued February 12, 2019, $50,000 on February 21, 2019, and $100,000 on April 8, 2019.[109]  The second and third payments were again sent because of additional Sworn Statements in Proof of Loss.  These payments, totaling $250,000, were advanced for damages to the waterpark.[110]  In response to a March 4, 2019, email from Mr. Friedman, Mr. Barron responded that there was a sublimit of $2,500 per sign.[111]  In all of the sworn statements in proof of loss and final settlement, Vintro did not disclose that Sinmier had an interest in the proceeds.

Everest settled the claim on June 29, 2018, by a further payment of $775,000, and, including the three partial payments, totaling $1,250,000.[112]  This was comprised of the $1,000,000 limit on the waterpark and $250,000 for business interruption.  It should be noted that a mortgagee only has rights to payments for damage to property, not business interruption.

*Post Loss and Foreclosure*

Ohio Edison records show a move-out date of March 20, 2019, for Vintro.[113]  Utilities were shut off on March 21, 2019.[114]  The last Ohio Edison statement for Vintro was dated April 17,

---

[109] Complaint, ¶ 30; Bankers 1805 – Bankers 1812.
[110] Deposition of Barbara Loveland, 26:20 – 27:12; Bankers 331, Bankers 4739.
[111] V 97 – V 98.
[112] Complaint, ¶ 31; EVEREST 00638 – EVEREST 00644.
[113] OHIO_EDISON_000061, OHIO_EDISON_000062.
[114] OHIO_EDISON_000072.

2019 and showed a return of security deposit of $32,700.[115]  Sinmier inspected the property before the foreclosure lawsuit was filed on March 29, 2019, and there was no water in the basement.[116]

As of April 2, 2019, Sinmier, in its request for appointment of a receiver, stated that "the Collateral Property is in danger of being lost, removed, materially injured, or diminished in value as the facility was currently closed, the Borrower has not transferred the required licenses, that water has been shut off, the property appears to be unsecure, and the phone appears to be disconnected.[117]  Sinmier was concerned that Vintro was unable to maintain the property.[118] Sinmier knew the building was vacant and decreasing in value.[119]  On June 3, 2019, Sinmier requested an expedited hearing to appoint a receiver, as Perkins Township stated the property was unsecured and had been subject to vandalism and vagrancy.[120]

The Everest policy was canceled on May 17, 2019.[121]  By letter dated November 18, 2019, JS Held reported to Crawford the results of two inspections conducted on May 9, 2019, and November 7, 2019.[122]  Sinmier requested electrical service on December 5, 2019.[123]  On December 27, 2019, Sinmier acknowledged to security deposit requirement and requested service.[124]  On December 27, 2019, Sinmier Ohio Edison records show a move-in date of January 2, 2020, for Sinmier.[125]

---

[115] OHIO EDISON_000041.
[116] Bankers 2132.
[117] Deposition Exhibit 148, page 3.
[118] Deposition of Pargat Grewal, 165:3 – 5.
[119] Deposition of Pargat Grewal, 169:12 – 15.
[120] Deposition Exhibit 150.
[121] Complaint, ¶ 34; Bankers 0364.
[122] J.S.HELD_00166 – J.S. HELD_00169.
[123] OHIO_EDISON_000075.
[124] OHIO_EDISON_000073.
[125] OHIO EDISON_000061, OHIO_EDISON_000063.

*Sinmier's Claim Involvement*

Sinmier requested an updated certificate of insurance on September 10, 2019.[126]  On October 14, 2019, a notice of claim was sent to Berkley on behalf of Sinmier.[127]  The first time Ms. Loveland was aware of Sinmier was in the fall of 2019.[128]  Bankers, in an internal review, noted that Sinmier was added as an additional insured on the Everest Commercial General Liability policy but not as a mortgagee on the Everest property policy, as requested.[129]

On October 17, 2019, the notice of claim was forwarded to Everest by Ms. Loveland.[130]  The first reference to securing the premises was an email dated October 18, 2019.[131]  A deed of foreclosure dated October 4, 2019, was sent to Mr. Barron by Mr. Grewal on October 21, 2019, and noted that Superior Hospitality Group of Ohio was hired to manage the property.[132]

*Evidence of Property Insurance*

Bankers, after the first Evidence of Property insurance on August 23, 2018, reissued the same ACORD document several times.  On each Evidence of Property Insurance, a "for information only" disclaimer was included.  As stated in 1 Arnould, *Marine Insurance*:

> "It [a certificate of insurance] is not, and does not purport to be, a policy, but states that a policy covering the goods is in existence, and gives details of the vessel, voyage, subject matter and refers to the terms and condition of the policy."[133]

---

[126] Complaint, ¶ 33.

[127] Bankers 0347, Bankers 12879 – Bankers 12882.

[128] Deposition of Barbara Loveland, 36:17 – 24, 41:2 – 42:10.

[129] Bankers 12879; Deposition of Barbara Loveland, 46:20 – 48:5.

[130] Deposition of Barbara Loveland, 41:2 – 24; Bankers 0378 – Bankers 0379, Bankers 1033 – Bankers 1035.

[131] PERKINS 000005.

[132] Bankers 2132.

[133] As cited in *Atlas Assur. Co. v. Harper, Robinson Shipping Co.,* 508 F.2d 1381 (9th Cir. 1975).

The property and liability insurance industry have the same view as marine underwriters, that the policy terms and conditions would control at the time of loss.

It is not unusual for insurance companies to delay issuing policies for months after the inception date.  If a mortgagee desires proof of insurance, they should have requested a "binder." A binder is a temporary written or oral agreement legally binding agreement that serves as a temporary contract until the policy is issued.  As an informal written contract, it summarizes the basic coverages and terms of the insurance agreement.

In this case, Sinmier is conflating the Evidence of Property Insurance with a binder.  A binder is a contract, where the Evidence of Property Insurance clearly states that "this evidence of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the additional interest."[134]

Because Sinmier did not receive a binder, it should have requested a copy of the insurance policy rather than rely on the Evidence of Property Insurance.  One of the fundamental problems with an Evidence of Property Insurance is that, although they are expressly intended to certify the existence of insurance, there is in fact no guarantee that the policy in the Evidence of Property Insurance actually exists.  An Evidence of Property Insurance is only evidence of an insurer's intent to provide coverage but is not a contract to insure the designated party nor is it conclusive proof, standing alone, that such a contract exists.  By requesting a copy of the policy, Sinmier would have the opportunity to review the policy to determine whether it provided the necessary coverage.

---

[134] BERKLEY_000084.

*Berkley Builders' Risk Policy*

To the extent that claims against any of the defendants exist based on the Berkley Evidence of Property Insurance, one must look at the Berkley policy as it applies to the facts in this matter. The Berkley policy was a Builders' Risk Policy based on the AAIS coverage form, IM 7050.  As typical in builders' risk forms, the existing building or structure is listed under property not covered.[135]  This was resolved by the attachment of the Rehabilitation and Renovation Coverage Endorsement, IM 7070.[136]  The limits for the existing buildings are found on the Rehabilitation and Renovation Schedule of Coverages, IM 79 70, on a Stated Value Basis.[137]  The endorsement, in Coverage, restricts coverage to the "existing buildings" that are part of "your" "rehabilitation or renovation project."[138]

The endorsement has a Vacant Building Limitation for the "existing building" for 60 days,[139] which was, by an entry in the Schedule of Insurance, reduced to 15 days from the inception of the policy.[140]  After 15 days from the inception date of the policy, the "existing buildings" become property not covered "unless:

    a.   building permits have been obtained; and

    b.   rehabilitation or renovation work has begun on the "existing building".[141]

---

[135] BERKLEY_000024, Property Not Covered, 5. Standing Building or Structure.
[136] BERKLEY_000044 – BERKLEY_000047.
[137] BERKLEY_000072 – BERKLEY_000073
[138] BERKLEY_000044, Property Covered, 1. Coverage.
[139] BERKLEY_000044.
[140] BERKLEY_000073.
[141] BERKLEY_000135 – BERKLEY_000136.

Based on the documents and testimony, the Cabana Building was never occupied after the date of purchase, September 6, 2018. Because of the Vacant Building Limitation, coverage would have ended long before the January 2019 wind and water loss to the Maui West building.

Utilities were shut off on March 21, 2019.[142] In a best-case scenario for Sinmier, coverage would have ceased on April 5, 2019, 15 days later. Sinmier inspected the property before the foreclosure lawsuit was filed on March 29, 2019, and there was no water in the basement.[143] Sinmier in its expert reports has not shown what, if any of the damages occurred after March 29, 2019, and before April 5, 2019.

Assuming that the Berkley policy described in the Evidence of Property Insurance was not canceled flat, the 15 days become even more relevant. The Evidence of Property Insurance issued on February 8, 2019, showed a policy effective date of August 23, 2018.[144] Two things must occur no later than September 7, 2018, 15 days after the policy inception. First, building permits would have to be obtained. The record shows that no building permits were obtained. Second, rehabilitation or renovation work has begun on the "existing building". Both requirements must be met, and neither were.

This comports with the insuring agreement. The Builders'' Risk Coverage IM 7050, under coverage, states "[w]e cover direct physical loss or damage caused by a covered peril to "buildings or structures" *while in the course of construction, erection, or fabrication.*"[145] The Rehabilitation and Renovation Coverage Endorsement does not reference "while in the course of construction,

---

[142] OHIO_EDISON_000072.
[143] Bankers 2132.
[144] BERKLEY_000084.
[145] BERKLEY+000023, Property Covered, Course Of Construction, 1. Coverage.

erection or fabrication" in the insuring agreement,[146] however, the same underwriting result is achieved by requiring permits and construction to start within 15 days of the effective date.

Builders' Risk policies are unique in that coverage can end earlier than the expiration date of the policy.  Coverage ceases if the "building or structure" is occupied in whole or in part or put to its intended use.[147]  This was addressed on the declaration page with Permission to Occupy after August 23, 2018.[148]

Following that condition, the second condition is entitled "When Coverage Ceases", which states that "coverage will end when one of the following first occurs:

    a.   this policy expires or is canceled;

    b.   a covered "building or structure" is accepted by the purchaser;

    c.   "your" interest in the covered property ceases;

    d.   ***"you" abandon construction with no intent to complete it;*** or [emphasis added]

    e.   a covered "building or structure" has been completed for more than 90 days."[149]

The facts in this case, based on Ohio Edison records, show a move-out date of March 20, 2019, for Vintro.[150]  Applying this fact against the plain reading of this condition, it appears that Vintro "abandoned construction with no intent to complete it" on March 20, 2019.  When Sinmier inspected the property before the foreclosure lawsuit was filed on March 29, 2019, coverage had already ceased.[151]

---

[146] BERKLEY_000044, Property Covered, 1. Coverage.
[147] BERKLEY_000041, Additional Coverage Limitations, 1. Occupancy and Use.
[148] BERKLEY_000022.
[149] BERKLEY_000041.
[150] OHIO_EDISON_000061, OHIO_EDISON_000062.
[151] Bankers 2132.

In summary, based on the Berkley Builders Risk Policy terms and conditions:

1. The Vacant Building Limitation caused coverage to cease 15 days after the policy inception date (August 23, 2018) on September 7, 2018; or

2. Vintro's moving out and turning off the power on March 20, 2019, caused the coverage to cease under The When Coverage Ceases Limitation related to abandonment with no intent to complete it.

*Damages*

The Gross/Globe report, upon review, is a report related to the project costs to remodel the entire complex.  It appears that the Gross/Globe report includes aspects of planned renovations by Vintro.  It lacks, in summary, any comments or analysis related to how the claimed damages relate to a covered cause of loss under either the Berkley or Everest policies or when the unspecified losses occurred.  In essence, it is a report that an individual or business would take to a bank to obtain a loan to remodel the building.  The claimed damages are about five times what Vintro paid for the property, $4.85 million.

As an example of lack of analysis related to a covered cause of loss, vandalism occurred on the premises.  As previously discussed, the Berkley policy described in the Evidence of Property Insurance had already ceased on September 7, 2018.  The Everest policy, as respects vandalism, states:[152]

---

[152] EVEREST 00205.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

A review of the Gross/Globe report does not include an analysis of vacancy based on the policy definition that 31% of the square footage of each building had to be rented.  The Cabana building, from the date of purchase, was never occupied, therefore would be considered a vacant building.  Likewise, there was no analysis of the Maui West or Family Suites building in relation to the 31%.  Certainly, after the move-out date of March 20, 2019, all buildings would be considered vacant by definition.

The Everest policy, continuing, states:[153]

---

[153] EVEREST 00205.

34

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

    (a) Vandalism;

    (b) Sprinkler leakage, unless you have protected the system against freezing;

    (c) Building glass breakage;

    (d) Water damage;

    (e) Theft; or

    (f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

As a point of reference, 60 days after March 20, 2019 (the move-out date), is May 19, 2019. On June 3, 2019, Sinmier requested an expedited hearing to appoint a receiver, as Perkins Township stated the property was unsecured and had been subject to vandalism and vagrancy.[154] To the extent that the Gross/Globe report includes damages arising out of vandalism, sprinkler leakage, building glass breakage, water damage, theft, or attempted theft, those damages are excluded. Any other loss would be reduced by 15%. The problem is, that the Gross/Globe report does not provide any detail on dates and causation of damages, it is just a remodeling budget.

Beyond the Gross/Globe report failing to establish the causation of loss, no analysis was done as to when the damages occurred. It is a basic insurance principle that an insured must prove a covered loss occurred during the policy period. The record includes documents that prior to the purchase by Vintro, a loss had occurred. It is unclear whether the repairs were completed, as the adjuster notes indicate that there was a dispute related to the payment of the claim between Vintro

---

[154] Deposition Exhibit 150.

35

and the seller.  A deed of foreclosure was dated October 4, 2019, and any losses after that date would not be covered.[155]  Sinmier ceased having an interest as mortgagee on that date and became the owner of the property.  Bankers, Berkley, and Everest never agreed to procure insurance on behalf of or insure Sinmier as a named insured.

The known loss doctrine is a common law principle that prohibits one from obtaining insurance for a loss that either has already taken place or is in progress.  It is based upon the fundamental requirement of fortuity in insurance law.  In other words, the doctrine recognizes that the purpose of insurance is to protect an insured against unknown risks (an insurance carrier protects against a risk; not a certainty).  Insurance no longer serves its purpose of risk-spreading when there is no risk of loss, such as when a loss has already occurred before a policy takes effect.  Thus, the known loss doctrine precludes coverage when the insured knows that a specific loss has already happened or is substantially certain to happen.

It is a fundamental requirement in insurance that the insurer will not pay for a loss unless the loss is "fortuitous," meaning that the loss must be accidental in some sense.  Losses that are certain to occur, or which have already occurred are not fortuitous.  This principle explains why a person cannot suffer a loss and then subsequently purchase insurance to cover that loss. It is axiomatic that a known loss that has already occurred is not uncertain to occur.  The Gross/Globe report failed to identify and quantify the demolition (such as removing the sheet rock and copper lines) that had occurred in the preparation of the demolition of the two buildings.  It also failed to identify and quantify the damages from the loss that occurred prior to the closing by Vintro.

---

[155] Bankers 2132.

36

Beyond the lack of analysis on causation, the report also does not reflect any analysis in relation to the terms and conditions of either the Berkley or Everest policies.  As an example, the report includes $275,000 of damages for two signs.  The Berkley policy did not provide coverage because they were not an "existing building"[156] and the Everest policy, under Limits of Insurance, stated that there was a $2,500 per sign occurrence limit.[157]

$1.7 million was for the renovation of the rooms to meet ADA standards for the family suites.[158]  This was not mentioned in the Gross/Globe report, and these expenses would not be covered by exclusion and the known loss doctrine.  Another example is the inclusion of $297,512.25 for the upgrade of the fire alarm system to comply with the current code from the authority having jurisdiction.[159]  While this code upgrade was easy to identify because it was a separate line item, the Gross/Globe report did not break out the code upgrades for the remainder of the claimed damages, such as the known expenses related to ADA compliance.  The Everest policy states:[160]

---

[156] BERKLEY_000044.
[157] EVEREST 00202.
[158] Deposition of Pargat Grewal, 92:18 – 22.
[159] SIM 20148.
[160] EVEREST 00224.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   a. **Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

The limits of insurance on the Berkley Builders' Risk policy were completed values that contemplated the demolition, renovation, and re-construction of the "existing buildings" on a Stated Value Basis.[161]  Stated value, as a valuation technique, resolves the issue of compliance with coinsurance.  Builders' risk policies are typically 100% contracts, so it is common in course of construction to see stated value for "existing buildings" with no-coinsurance.  The loss payment is still subject to the terms and conditions of the policy.

The Everest $6,000,000 value was on a Replacement Cost basis at 100% coinsurance.[162] The claimed damages in the Globe report are for all buildings and structures on the premises in

---

[161] BERKLEY_000045, BERKLEY_000073.
[162] EVEREST 00191.

the amount of $24,731,272.97.[163]  Everest outlines the calculation of coinsurance in their policy.[164]

Vintro purchased approximately 24% of the required limits to comply with the coinsurance

formula.   There was no reconciliation of how the claimed damages relate to the limits and

coinsurance.

The record shows that the power was turned off on March 20, 2019.  The report is silent as

to the damage caused by the electricity being turned off, which caused the basement to flood.  The

Special Cause of Loss Form, CP 00 30 09 17, in the Everest policy states:

> **2.** We will not pay for loss or damage caused by or resulting from any of the following:
>
> **m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss. [165]

The Everest policy includes an endorsement entitled Water Damage Exclusion, ECP 10

522 08 08.  It states it replaces the water exclusion in the policy.  Its endorsement states:[166]

---

[163] SIM 20217.
[164] EVEREST 00206.
[165] EVEREST 00227.
[166] EVEREST 00193.

A. The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.

B. **Water**

1. Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2. Mudslide or mudflow;

3. Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

4. Water under the ground surface pressing on, or flowing or seeping through:

   a. Foundations, walls, floors or paved surfaces;

   b. Basements, whether paved or not; or

   c. Doors, windows or other openings; or

5. Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

The exclusion above applies whether any of the above, in paragraphs **1.** through **5.**, is caused by an act of nature or man-made event regardless of any other cause or event that contributes concurrently or in any sequence to the loss, including but not limited to the failure of a dam, levee, seawall or other boundary or containment system in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

The Gross/Globe report did not address either of these two exclusions.  The power was turned off, therefore, the sump pumps would not operate.  The causation of the standing water was not accidental, and due to the intentional acts of Vintro by turning off the power.

The Gross/Globe report presents damages on a replacement cost basis, not an actual cash value basis.  If there is a covered loss, the actual cash value would be tendered as an undisputed amount, with a depreciation holdback.  As a general rule, only the named insured can make a claim on a replacement cost basis.  The Everest policy states, with "you" being Vintro:[167]

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

---

[167] EVEREST 00208.

40

After the named insured repairs or replacing the property, the insurance company then pays the holdback. The Everest policy states:[168]

> **d.** We will not pay on a replacement cost basis for any loss or damage:
>
> **(1)** Until the lost or damaged property is actually repaired or replaced; and
>
> **(2)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

The only time that a mortgagee can receive replacement cost is when the claim is denied because of the named insured's acts or failure to comply with the terms of the Coverage Part. Paragraph d., which was previously discussed as not applying, states:

> **"2. Mortgageholders**
>
> **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:
>
> **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;
>
> **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and
>
> **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.
>
> All of the terms of this Coverage Part will then apply directly to the mortgageholder."[169]

If all three requirements are met, then the bottom statement applies. All of the terms would include replacement cost for the mortgagee, and be adjusted accordingly up to the mortgagee's interest.

---

[168] EVEREST 0208.
[169] Everest 00207.

The Everest policy continues stating that if a claim payment is made to the mortgageholder and not to an insured, the insurance company inherits a proportion of the mortgageholder's rights under the mortgage based on the extent of claim payment, and the mortgageholder retains subrogation rights and may attempt to recover the full amount of the claims.  The Everest policy states:

> e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:
>
> (1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and
>
> (2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.
>
> At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

# CONCLUSION

Insurance agents in Ohio, like the rest of the United States, rely on a customer to perform certain duties, just as the customer relies on the insurance agent to perform certain duties.[170]  The customer duties relied upon include:

1.  Requesting the specific coverage desired, including, whether to insure a particular risk and the extent of coverage for that risk;

2.  Determining which insurer(s) to use;

3.  Determining which insurance agent(s) to use;

---

[170] See *Damon's Missouri, Inc. v. Davis,* 63 Ohio St.3d 605 (1992).

4.  Completing applications or otherwise cooperate in the application process;

5.  Reviewing the application and updating it as necessary;

6.  After receiving the policy, ensuring the particular provisions are acceptable;[171]

7.  To read the policy, and in doing so, ask for an explanation of any confusing provisions, and ask the insurance agent to change any unacceptable provisions;

8.  If coverage needs to be changed, inform the insurance agent and ask for changes; and

9.  Asking the insurance agent to renew the policy.[172]

Vintro failed to perform many of these responsibilities when it purchased the insurance program.  Vintro never expressed dissatisfaction or concern about the policy limits to Bankers.

A special relationship never existed between Bankers and Sinmier because Bankers never offered, nor did it ever to agree, to perform any of these responsibilities.[173]  No compensation, other than the commission received from Everest, was paid to Bankers by either Vintro or Sinmier.[174]  Based on these objective criteria, it appears that an ordinary insurance agent-customer relationship existed between Bankers and Vintro, and it would not be the custom and practice of insurance agents in Ohio to recommend increased coverage unless requested by the customer.[175]

---

[171] See *The Island House Inn, Inc. v. State Auto Ins. Cos.,* 150 Ohio App. 3d 522 (2002).

[172] Clarence E. Hagglund, J.D., *Insurance Producer Liability: In Plain Language,* (Minneapolis: Common Law Publishing, Inc., 1991).

[173] See *Slovak v. Adams*, 141 Ohio App.3d 828 (2001).

[174] Deposition of Michael Barnum, 49:16 – 20.

[175] See *Tornado Techs., Inc. v. Quality Control Inspection, Inc.,* 2012-Ohio-3451, ¶ 19, ¶¶ 24-30, 977 N.E.2d 122, 145-127 (2012).

Insurance agents are trained that if they agree to a particular task, such as procure the appropriate coverage, then the insurance agent should follow the customer's coverage instructions with reasonable skill, care and diligence.[176]  Reasonable care in following the customer's coverage instructions requires (1) accurately recording the client's answers to questions; (2) promptly submitting the application to the insurer; (3) diligently canvassing the insurance market for hard-to-place coverages; and (4) promptly informing the customer if the coverage is not available.  Thus, an agreement to procure insurance is an agreement to use best efforts; it is not a guarantee of success.  It is custom and practice for an insurance agent, such as Bankers, to rely on the answers provided by Vintro on the applications to Berkley and Everest.  Insurance agents do not verify the representations on an application.

Bankers exercised good faith and reasonable diligence in obtaining the insurance that Vintro requested.  In my review of the documents, I did not find a fiduciary relationship between Bankers and Vintro or Sinmier.[177]  A fiduciary relationship cannot be unilaterally created.[178]  There was nothing in the documents to show that Vintro was relying on the advice of Bankers, and in fact, Vintro chose the limits for the property insured and specified which buildings to insure.

The Everest policy that was procured sufficiently covered Vintro's interests on the best terms available to Vintro.  Vintro advised Bankers that buildings two and three would be demolished and advised Bankers that the contractor would procure coverage for the reconstruction.

---

[176] See *Moor v. Am. Family Ins. Co.,* 3d Dist. No. 4-09-13, 2009-Ohio-4442, 2009 WL 2710071.

[177] The Ohio Supreme Court has defined a "fiduciary relationship" as one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Nichols v. Schwendeman,* 10th Dist. No. 07AP-433, 2007-Ohio_6602, 2007 WL 4305718.

[178] See *Horak v. Nationwide Ins. Co.,* 9th Dist. No. CA 23327, 2007-Ohio-3744, 2007 WL 2119861.

It is not the custom and practice of the insurance industry to explain a document to a customer or insured.[179]

Based on my review of the documents, I come to the inexorable opinion that Bankers complied with their customers' requests and instructions and met the standard of care in the procurement of insurance relating for Vintro.  As for the losses sustained by Sinmier, these claimed losses have not been presented based on the terms and conditions of any insurance policy.  The opinions outlined in this report by me are stated to a reasonable degree of professional certainty.

_____
R. Bryan Tilden
CPCU, CLU, ARM, ALCM, ChFC, CIC

---

[179] See *Wilmering v. Lexington Insurance Co.,* 678 S.W.2d 865 (1984), where the court held that there is no duty to explain an insurance policy to the insured.

*Curriculum Vitae*
*of*

**R. Bryan Tilden**
526 Red Gate Road
Pittsboro, North Carolina 27312-7934
*Office:* 919.542.1042 • *Fax:* 919.542.6255 • *E-mail:* tilden@mindspring.com

---

| | |
|---|---|
| **EDUCATION:** | **Senior Claim Law Associate,** 2008<br>AMERICAN EDUCATIONAL INSTITUTE, INC.<br>Basking Ridge, New Jersey |
| | **Chartered Financial Consultant,** 1983<br>THE AMERICAN COLLEGE<br>Bryn Mawr, Pennsylvania |
| | **Associate in Loss Control Management**, 1983<br>INSURANCE INSTITUTE OF AMERICA<br>Malvern, Pennsylvania |
| | **Associate in Risk Management**, 1982<br>INSURANCE INSTITUTE OF AMERICA<br>Malvern, Pennsylvania |
| | **Chartered Life Underwriter**, 1982<br>THE AMERICAN COLLEGE<br>Bryn Mawr, Pennsylvania |
| | **Chartered Property Casualty Underwriter**, 1980<br>THE AMERICAN INSTITUTE FOR PROPERTY AND LIABILITY UNDERWRITERS<br>Malvern, Pennsylvania |
| | **Certified Insurance Counselor**, 1978<br>SOCIETY OF CERTIFIED INSURANCE COUNSELORS<br>Austin, Texas |
| **HONORS/ACTIVITIES:** | Active, Continuing Education for CPCUs, Society of Chartered Property Casualty Underwriters, 2021 - 2024 |
| | Grading Panel Member, The American Institute for Property and Liability Underwriters |
| | Grading Panel Member, Insurance Institute of America |
| | National Faculty Member, Society of Certified Insurance Counselors |
| | Faculty, ACORD Power of Change Workshop, 1995 to present |
| | Faculty, Independent Insurance Agents Virtual University, commentator to ISO, AAIS and ACORD |
| | Ernest F. Young Education Award, 1988 |
| | North Carolina Independent Agent of the Year, 1989 |
| | Frequent contributor the *The John Liner Letter* articles on Business Income, CGL, Auto, Risk Management |
| | Reviewer, various CPCU and Insurance Institute textbooks |

*R. BRYAN TILDEN*     *PAGE 2*

**MEMBERSHIPS:**     International Association of Arson Investigators

Professional Liability Underwriting Society

Society of Certified Insurance Counselors

Society of Chartered Property Casualty Underwriters

Society of Claims Law Associates

Society of Financial Service Professionals

**LICENSES:**     Property and Liability Agent, North Carolina, New Jersey

Life and Health Agent, North Carolina, New Jersey

Medicare Supplement and Long Term Care Agent, North Carolina

**EXPERIENCE:**     April 1997 to Present
**Training and Consulting**
Tilden & Associates
Pittsboro, North Carolina

September 1995 to March 1997
**Director of Technical Affairs**
Independent Insurance Agents of North Carolina, Inc.
Raleigh, North Carolina

March 1990 to August 1995
**Director of Education**
Independent Insurance Agents of North Carolina, Inc.
Raleigh, North Carolina

September 1983 to March 1990
**Account Executive**
Chapel Hill Insurance Agency, Inc.
Chapel Hill, North Carolina

September 1979 to July 1983
**Vice President**
Thomas Rutherfoord, Inc.
Roanoke, Virginia

December 1978 to September 1979
**Account Executive**
Marsh & McLennan, Inc.
Washington, DC

July 1974 to December 1978
**Account Executive**
Herb Holland Company, Inc.
Chapel Hill, North Carolina

**PUBLICATIONS:**     The CPCU Society. "A Guide to the CGL Aggregate Limits",
http://www.cpcusociety.org/learning/campus/how.shtml , 1999

The CPCU Society, "A Guide to the Motor Carrier Act",
http://www.cpcusociety.org/learning/campus/how.shtml. 1999

*R. BRYAN TILDEN*          *PAGE 3*

The CPCU Society, "A Guide to Value Reporting Form", http://www.cpcusociety.org/learning/campus/how.shtml. 1999

R. Bryan Tilden, *1999 Business Auto Policy, Changes and Issues* (Albany: Professional Insurance Agents, 1999)

----, *2000 Commercial Property Changes* (Malvern: The CPCU Society, 2000)

----, *2000 Homeowners Policy Changes* (Malvern: The CPCU Society, 2000)

----, *2001 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2001)

----, *2001 Business Automobile Policy Changes* (Pittsboro, NC: Tilden and Associates, 2001)

----, *2002 Commercial Property Changes* (Malvern: The CPCU Society, 2002)

----, *2004 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2004)

----, *2007 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2007)

---- *2008 Commercial Property Changes* (Malvern: The CPCU Society, 2008)

----, *2010 Automobile Policy Changes* (Malvern: The CPCU Society, 2011)

----, *2011 Homeowners Policy Changes* (Malvern: The CPCU Society, 2011)

----, *2012 Commercial Property Policy Changes* (Malvern: The CPCU Society, 2013)

----, *2013 Commercial General Liability Policy Changes* (Malvern: The CPCU Society, 2013)

----, *Additional Insured* (Austin: Society of Certified Insurance Counselors, Inc., 1996, 2005, 2013; Malvern: The CPCU Society, 1999, 2001, 2004, 2005, 2013, 2019)

----, *Advanced Business Income* (Malvern: The CPCU Society, 1990 – 2016)

----, *Advanced Inland Marine* (Malvern: The CPCU Society, 2000)

----, *Advanced Pollution Liability* (Malvern: The CPCU Society, 1999 - 2021)

----, *Arson and the Insurance Contract* (Austin: Society of Certified Insurance Counselors, Inc., 1998, 2004, 2012, 2022)

----, *Bonus Life and Non-Qualified Deferred Compensation Plans* (Pittsboro, NC: Tilden and Associates, 1998)

----, *Budgeting* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1995)

R. Bryan Tilden and Donald Malecki, *Builders Risk, Wrap-Ups and Course of Construction* (Malvern.  The CPCU Society, 2006)

*R. BRYAN TILDEN*                    *PAGE 4*

R, Bryan Tilden, *Business Automobile Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1993, 1994, 1997, 1999, 2002, 2004, 2005, 2006, 2010, 2013)

----, *Business Owner's Policy* (Austin: Society of Certified Insurance Counselors, Inc., 1990 – 2002, 2010, 2013)

----, *Claims Handling* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Closing Gaps in Property Insurance* (Malvern: The CPCU Society, 1999, 2007, 2015)

----, *Commercial Account, The* (Malvern: The CPCU Society, 1999, 2001, 2005)

----, *Commercial Crime Program* (Austin: Society of Certified Insurance Counselors, Inc., 1988, 1991, 1992, 1999, 2000, 2006, 2013; Malvern: The CPCU Society, 2000, 2006, 2009, 2013)

----, *Commercial General Liability Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1992, 1994, 1996, 1997, 1998, 1999, 2001, 2004, 2007, 2013, 2019)

----, *Commercial Property Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Commercial Property Causes of Loss Forms* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Contract Bonds* (Pittsboro, NC: Tilden and Associates, 1999)

R. Bryan Tilden and Donald Malecki, *Contractual Risk Transfer* (Malvern.  The CPCU Society, 2005)

R. Bryan Tilden, *Director's and Officer's Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1997; 2002, 2022 Malvern: The CPCU Society, 1998, 2000, 2002, 2022)

----, *Disability Income and Long Term Care Insurance* (Pittsboro, NC: Tilden and Associates, 2006)

----, *Employee Leasing – The New CGL.* Counselor C93 #6 December (1993): 1-4

----, *Employment Related Practices* (Pittsboro, NC: Tilden and Associates, 1999, 2011, 2015)

----, *Endorsements to the Commercial Property Coverage Part* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1996, 2001, 2008, 2012)

----, *Essentials of Legal Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1995)

----, *Essentials of Life Insurance* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1991)

----, *Estate Planning* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Estate Planning Techniques, Gifts, Trusts and Family Limited Partnerships* (Pittsboro, NC: Tilden and Associates, 2000)

R. Bryan Tilden and Donald Malecki, *Evolution of the CGL,* (Malvern. The CPCU Society, 2007)

*R. BRYAN TILDEN*          *PAGE 5*

R. Bryan Tilden, *Excess Liability and Commercial Umbrella Policies* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1995, 1997, 2013)

----, *Flood Insurance*, (Austin: Society of Certified Insurance Counselors, Inc., 1998)

----, *Garage Policy* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1993, 1994, 1998, 2006)

----, *Hidden Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1995, 1997, 2000; Malvern: The CPCU Society, 1998, 2004, 2010, 2013, 2022)

----, *Homeowner's Policy* (Pittsboro, NC: Tilden and Associates, 1998, 2001, 2011)

----, *Homeowner's Tricks and Traps* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1993, 1997, 2001, 2013, 2022)

----, *How to Determine the Financial Stability of an Insurance Company* Agents Journal Spring (1985) 18 - 19

----, *Human Resources* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1996)

----, *Insurance Fraud* (Pittsboro, NC: Tilden and Associates, 2001)

----, *Insurance Statute and Rules Update, An Agents' Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1991)

----, *Insuring Contractors* (Malvern: The CPCU Society, 1998, 1999, 2004, 2007, 2013)

----, *Insuring Defective Construction* (Malvern:  The CPCU Society, 2002, 2004, 2007, 2013; Austin: Society of Certified Insurance Counselors, 2002, 2004, 2007, 2013, 2019)

----, *Insuring the E-Commerce Account* (Malvern: The CPCU Society, 2000 – 2019)

----, *Insuring the In Home Business* (Austin: Society of Certified Insurance Counselors, 1998)

----, *Insurance Valuation Problems* (Malvern: The CPCU Society, 1997 – 2021)

----, "It's a Crime Not to Insure! Use New Crime Forms for the Best Coverage," *Resources* (The National Alliance for Insurance Education & Research), (Spring 2001), pp. 10-13.

----, *Law and the Life Insurance Contract* (Pittsboro, NC: Tilden and Associates, 2002)

----, *Leased Properties Exposures* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1997, 2005; Malvern: The CPCU Society, 1998, 2001, 2005, 2013)

----, *Liability Issues and Solutions* (Austin: Society of Certified Insurance Counselors, Inc., 1998)

R. Bryan Tilden and Donald Malecki, *Malecki and Tilden on the CGL,* (Malvern. The CPCU Society, 2003, 2004, 2005)

*R. BRYAN TILDEN*          *PAGE 6*

R. Bryan Tilden, *Medicare Supplement and Long Term Care* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1991, 1992)

----, *Mergers, Acquisitions and Joint Ventures* (Malvern:  The CPCU Society, 2001; Austin: Society of Certified Insurance Counselors, Inc., 2002, 2013)

----, *More Personal Lines Questions and Answers* (Pittsboro, NC: Tilden and Associates, 1997)

----, *N.C. Insurance Statutes and Rules Update, An Agents' Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1992)

----, *Personal Auto Policy* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1990, 1993)

----, *Personal Auto Policy* (Pittsboro, NC: Tilden and Associates, 1999)

----, *Personal Lines Questions and Answers* (Malvern: The CPCU Society, 1997, 1998, 2012)

----, *Personal Lines, Troublesome Problem Areas* (Indianapolis: Independent Insurance Agents of Indiana, 1997, 1998)

----, *Pollution Liability Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1991, 1998, 2012)

----, *Pollution and Environmental Liability Coverages* (Malvern: The CPCU Society, 1999 – 2021)

R. Bryan Tilden and John P. Young, *Pre-Licensing Guide* (Raleigh: Independent Insurance Agents of North Carolina, Inc., 1988, 1993)

R. Bryan Tilden, *Professional Liability* (Austin: Society of Certified Insurance Counselors, Inc., 1994, 1996, 1998)

----, *Problems and Solutions in Buy-Sell Agreements* (Pittsboro, NC: Tilden and Associates, 1998).

----, *Products and Completed Operations* (Malvern: The CPCU Society, 1999)

----, *Properly Insuring Churches, Clubs, Civic Groups and Other Not-For-Profit Organizations* (Austin: Society of Certified Insurance Counselors, Inc., 1991, 1998, 2001)

----, *Property & Liability Innovations and Solutions* (Austin: Society of Certified Insurance Counselors, Inc., 1998, 1999, 2001)

----, "Puzzled About Commercial Auto?" *Resources* (The National Alliance for Insurance Education & Research), (Fall/Winter 2001), pp. 8-9.

----, *Rental Car Exposures and Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1988, 1990, 1992, 1999)

----, *Shared Ownership of Property* (Austin: Society of Certified Insurance Counselors, Inc., 1989, 1990, 2001)

----, *Small Employer Group Benefits* (Raleigh, NC: Independent Insurance Agents of North Carolina, Inc., 1992)

*R. BRYAN TILDEN*          *PAGE 7*

----, *Solving Troublesome Liability Issues* (Austin, Society of Certified Insurance Counselors, Inc., 2016 – 2021)

----, *Solving Troublesome Property Issues* (Austin, Society of Certified Insurance Counselors, Inc., 2016 – 2021)

----, *Split Dollar Plans* (Pittsboro, NC: Tilden and Associates, 1998)

----, *Time Element Coverages* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1996, 2001, 2008, 2012)

----, *Tips, Tricks and Traps of the CGL* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1998, 1999, 2012; Malvern: The CPCU Society, 2000 – 2021)

----, *Toxic Mold, Where Is The Coverage?* (Malvern: The CPCU Society, 2003, 2004, 2008, 2010, 2013)

----, *Umbrella and Excess Liability* (Malvern, The CPCU Society, 2004, 2013)

----, *Underwriting Workers Compensation* (Pittsboro, NC: Tilden and Associates, 2003)

----, *Utilizing the New Commercial Coverages* (Albany: Professional Insurance Agents, 2003)

----, *Will the Policy Pay for Rebuilding?* <u>Professional Agent</u> February 1998: 24 - 27

----, *Workers' Compensation* (Austin: Society of Certified Insurance Counselors, Inc., 1990, 1992, 1997, 2012)

----, *Workers' Compensation: Treating the Exposure* (Malvern: The CPCU Society, 2000)

----, *Workers' Compensation: Underwriting* (Malvern: The CPCU Society, 2000)

**CASES PAST 4 YEARS:**

Deposition

*Carlos Perez Diaz, et al, v. <u>Banco Popular de Puerto Rico</u>, et al,* CAC 2017-0014, Court of First Instance, Superior Part of Arecebo, Commonwealth of Puerto Rico.

Deposition

*Conrad Sales Group, LLC d/b/a Bay Hill Seafood v. Joseph Clyde Jenkins, Jr., Jenkins Insurance Agency, Inc. and <u>Nationwide Mutual Insurance Company,</u>* 16 CVS 493, Superior Court of Guilford County, North Carolina.

Deposition

<u>*Patsy E. Holden, et al,*</u> *v. Tedford and Associates, LLC, et al,* CJ-2018-188, District Court of Rogers County, Oklahoma.

Deposition

*Whitney J. Cagle v. <u>Westfield Insurance Company</u>*, 1816-CV22073, Circuit Court of Jackson County, Missouri, at Independence.

Report

*Buckley, LLP v. <u>Series 1 of Oxford Insurance Company NC, LLC</u>,* 19-CVS-2118, Superior Court of Mecklenburg County, North Carolina.

Report

*Woodland Park Baptist Church v. <u>Selective Insurance Company of South Carolina</u>*, 1:19-cv-00280, United States District Court for the Eastern District of Tennessee, Southern Division.

*R. BRYAN TILDEN*          *PAGE 8*

Report | *Natural Blend Vegetable Dehydration, LLC, v. SIA Group, Inc.*, 4:19-CV-42-BR, In the United States District Court for the Eastern District of North Carolina, Eastern Division.

Report | *Mutual Benefit Insurance Company v. R. Gates Construction Co., Inc.,* 1:20-cv-69. United States District Court for the District of Maryland, Baltimore Division.

Report | *Americas Leading Finance, LLC v. QBE Seguros Puerto Rico, et al*, SJ2018CV08332, Court of First Instance, Superior Part of San Juan, Commonwealth of Puerto Rico.

Report | *Mt. Hawley Insurance Company v. Carriage Hill Associates of Charleston, LLC, et al*, 2:19-cv-02550-RMG, United States District Court, District of South Carolina, Charleston Division.

Report | *Brian Shanahan, et al, v. Brett Balsley and BCA Insurance Group,* ATL-L-1387-18, Superior Court of New Jersey, Law Division, Atlantic County.

Report | *TJS Leasing & Holding Company, Inc., v. Peoplelease, LLC*, 2:19-cv-02550-RMG, United States District Court, District of South Carolina, Charleston Division.

Trial | *Alex Chrysanithopoulos, et al, v. Bay Agency Insurance Group, et al,* L-1054-19, Superior Court of New Jersey, Law Division, Monmouth County.

Report | *Nicole Kozak, et al, v. Michelle Yeomans and Mid Florida Crop Insurance Agency, Inc.,* 18-CA-000715, Circuit Court of the Twentieth Judicial Circuit, Hendry County, Florida.

Report | *Ashley and Benjamin Remick v. Travelers Home and Marine Insurance Company,* 7:19-cv-0254-DCC, United States District Court, District of South Carolina, Spartanburg Division.

Deposition | *Pennsylvania National Mutual Casualty Insurance Company v. Beach Mart, Inc. and L&L Wings, Inc.,* 2:14-cv-00008-FL, United States District Court for the Eastern District of North Carolina, Eastern Division.

Report | *DMM Associates, LLC, v. Ohio Security Insurance Company, David Jurisz, and Lakeside Insurance Brokers,* 7:27-cv-20-6879, District Court, County of Hennepin, Fourth Judicial District, State of Minnesota.

Deposition | *Continental Western Insurance Company v. ASAO Hauling LLC and Michael Krumm v. Naught-Naught Insurance Agency,* 2:20-cv-4063-NKL, United States District Court for the Western District of Missouri, Central Division.

Report | *Kathleen Jennings v. The Travelers Home and Marine Insurance Company,* 6:20-cv-00869-BHH, United States District Court for the District of South Carolina, Greenville Division.

R. BRYAN TILDEN          PAGE 9

Report

*Grooms Property Management, Inc., et al, v. Muirfield Condominium Association, et al, v. Holly Moore and TC Corporate Holdings, Inc., f/k/a TriSure Corporation*, 20-CVS-269, Superior Court of Mecklenburg County, North Carolina.

Deposition

*William G. Jenkins, Jr., as Receiver for JBS, LLC, d/b/a Jennings Building Systems v. Turbeville Insurance Agency, Inc., et al,* 2018-CP-07-01948, In the Court of Common Pleas, Beaufort County, South Carolina, Fourteenth Judicial District.

Report

*Fireman's Fund Insurance Company v. Regions Insurance Inc., et al,* SD File No: 3003-070, Private Arbitration.

Deposition

*Palomino v. First Developers, LLC, v. The Benefits Consulting Group, et al,* HUD-L-4285-19, Superior Court of New Jersey, Law Division – Hudson County.

Deposition

*Ecovest S&S Shelmore Development, LLC v. Atlantic Shield Insurance Group, LLC,* 2019-CP-10-954, Court of Common Pleas for the State of South Carolina, Charleston County.

Deposition

*Duke University v. Endurance Risk Solutions Assurance Company,* 5:20-cv-672-BO, United States District Court for the Eastern District of North Carolina, Western Division.

Deposition

*Wake Chapel Church, Inc. v. Church Mutual Insurance Company,* 5:21-cv-114-M, United States District Court for the Eastern District of North Carolina, Western Division.

Deposition

*Wilson, et al, v. Interwest Insurance Services, LLC,* 34-2018-00239219, Superior Court of California In and For the County of Sacramento.

Report Apostille

*Puerto Rico Highway and Transportation Authority v. Mapfre Praico Insurance Company, et al,* SJ2019CV09747, Commonwealth of Puerto Rico, Court of First Instance, San Juan Superior Division.

Report

*American Recycling Services, Inc., et al, v. Global Underwriters Agency, Inc., et al,* MID-L-8299-19, Superior Court of New Jersey, Law Division – Middlesex County.

Report

*Riddhi Vinayak Hotels, LLC, D/B/A/ Suburban Extended Stay and Motel 6 v. The Insurance Center, et al,* 6:21-cv-1320-DCC, United States District Court for the District of South Carolina, Greenville Division.

Report

*Adam Jones, et al, v. Crum & Forster Specialty Insurance Company,* 7:22-cv-00025-FL, United States District Court for the Eastern District of North Carolina, Southern Division.

Report

*Jacovitch Industrial Construction, Inc. v. Conway & Company, Inc.,* 22-CVS-68, Superior Court of Person County, North Carolina.